FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

03 MAR 27 AM 10: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| CENTRAL RESERVE LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 02-PT-1191-M |
| GEORGE E. LONG, | ) ) | |
| Defendant. | ) | |

ENTERED
MAR 27 2003

## MEMORANDUM OPINION

This cause comes on to be heard upon plaintiff Central Reserve Life Insurance Company's ("CRL") Motion to Compel Arbitration, filed on February 19, 2003.

## FACTS AND PROCEDURAL HISTORY

Plaintiff George E. Long ("Long") is a resident of Cullman County, Alabama. Long is currently unemployed and has been on medical disability for inoperable heart disease since September 2001. Prior to becoming disabled, Long operated a truck as an independent contractor hired by Baggett Transportation ("Baggett"). Long had contracted with Baggett for approximately sixteen (16) years. Professional Truckers Associations, Inc. ("ProTruck") is an insurance agency that specializes in marketing insurance products to the trucking industry. ProTruck is located in Birmingham, Alabama, and is owned and operated by Bill Mathis ("Mathis"). Mathis has been selling insurance as a general agent since 1957. In 2000, ProTruck employed Rhonda Hadley ("Hadley") as its office administrator and marketing coordinator. ProTruck enters into agreements with certain transportation companies authorizing ProTruck to solicit sales of insurance to truck drivers retained by these companies. CRL is a corporation

30

organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio. In 2000, Mathis was an independent agent appointed to sell CRL policies in the State of Alabama.

Long had been a customer of ProTruck for several years and had purchased insurance through ProTruck for many years prior to 2000. CRL contends that Long was treated by ProTruck as an employee or member of ProTruck for purposes of receiving group coverage through ProTruck. *See* Pl. Ex. A at 20-23; Pl. Ex. B at 9-11. Long denies that he was treated as an "employee or member" of ProTruck, specifically noting that Mathis testified that "ProTruck was not his employer, never was an never will be." *See* Def. Ex. 2 at 29-30. ProTruck had an agreement with Baggett, pursuant to which Baggett referred its truck drivers to ProTruck for insurance coverage. Once coverage was obtained, Baggett would deduct from the payroll any insurance premium amounts owed and remit those to ProTruck. ProTruck would then pay the premium amounts to the insurance carriers. Mathis described ProTruck as a "third party administrator." *See* Def. Ex. 2 at 9.

Prior to August 2000, Long had insurance coverage through Celtic Insurance Company that was purchased by Long through ProTruck. At that point, Long asked ProTruck to locate new insurance coverage for him that was less expensive than the coverage offered by Celtic Insurance Company. Hadley researched the market and located less expensive insurance coverage through CRL. An application for health insurance coverage was submitted to CRL by ProTruck on behalf of Long on August 7, 2000. Long testified that he knew that an application would have to be submitted to CRL in order to receive insurance. Hadley signed Long's name on the application submitted to CRL. Mathis testified that it was customary for someone in his

office to sign applications on behalf of truck drivers, and that he had Long's authorization. *See* Pl. Ex. B at 35-37. Long asserts that he never gave anyone permission to sign anything on his behalf.[1]

Although he claims he never gave anyone permission to sign on his behalf, Long does admit that he knew that CRL had issued a policy to him, that he had received information in the mail from CRL concerning his coverage, and that he had made claims under the policy. However, he contends that he did not receive a certificate booklet or an insurance policy from CRL. *See* Def. Ex. 1 at 28-29, 50-51. Long also contends that his decision to accept insurance coverage was based on what was actually sent to him, a summary of benefits. *See* Long Aff. at 2. According to Long, Mathis testified that he never delivered a copy of the actual policy to Long. *See* Def. Ex. 2 at 61-63, 68-69. CRL asserts that it has a business record that shows that Long's application for insurance was verified by phone. *See* Pl. Ex. C. On that form, the question "Did you personally sign and date the application?" is answered affirmatively. *Id.*[2] CRL issued a certificate of coverage to Long certifying that he was insured as of September 1, 2000.

As noted above, ProTruck had an agreement with Long and Baggett authorizing Baggett to deduct the premium from Long's paycheck. On August 7, 2000, ProTruck issued a check payable to CRL as payment for Long's first month's premium. CRL asserts that Long has

---

[1] Long also asserts that Mathis' statements regarding authorization are unreliable. Long notes that Mathis was out of work for most of 1999 and 2000 due to a medical condition. Mathis admitted that he had no first-hand knowledge as to the procurement of the insurance, specifically whether Long gave anyone permission to sign his name or not. Instead, Long argues, Mathis relied on what Hadley had told him, which would constitute hearsay in this court. *See* Def. Br. at 4-5.

[2] Long asserts that the record is hearsay, and that it is conjecture to say what the record means. *See* Def. Br. at ¶ 22.

3

contacted it several times regarding his policy, and that CRL has mailed to Long numerous documents, including an insurance certificate booklet, riders, correspondence, and an explanation of benefits. Long admits that he has received mail from CRL, but denies that he has received an insurance certificate booklet or any riders.

According to CRL, Long submitted claims under the policy for medical treatment incurred from July 2001 through October 2001, and received benefits for some of those claims. *See* Pl. Ex. D. Long admits that he filed claims for treatment, but denies that any amounts were paid prior to the filing of this lawsuit. He is unaware as to what, if any, bills have been paid since the lawsuit was filed.[3] CRL terminated Long's policy effective July 31, 2001, allegedly due to non-payment of premiums. Long admits that the policy was cancelled, and admits that it was relayed to him that the policy was terminated for non-payment of premiums. The insurance application submitted to CRL on behalf of Long contains the following language:

> By signing below, I acknowledge that:
>
> . . .
>
> (iii) Any disputes arising under the Policy are subject to an appeals procedure, including arbitration, which may be binding, depending on state law.

Long admits that the application contains this language, but denies that he ever signed the application. The application also had a separate "Acknowledgment of Arbitration" attached to it. *See* Pl. Ex. A, depo. ex. 2. Long counters that since he never saw or signed the application, he is unaware whether the form was attached or not. CRL also points to an "Alabama Coverage Rider," contained in the certificate of insurance, which contains an arbitration provision.

---

[3] Long argues that CRL's documentation is hearsay, and is unsubstantiated and unclear as to its purpose or meaning. *See* Def. Br. at ¶ 28.

*See* Larkin Aff. at Ex. D. Again, Long denies that he received a copy of the insurance policy, so he cannot say whether the rider was included or not.

On April 8, 2002, Long filed a complaint against CRL and others in the Circuit Court of Etowah County, Alabama. Long's complaint alleges breach of contract, bad faith refusal to pay claims, fraud, and negligence with regard to health insurance coverage. CRL filed this complaint on May 10, 2002, pursuant to 9 U.S.C. §§ 3-4, asking this court compel Long to arbitrate all of his claims.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") was designed "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Paladino v. Avnet Computer Techs., Inc.* 134 F.3d 1054, 1057 (11th Cir. 1998) (internal quotations and citations omitted). The FAA does not "require parties to arbitrate when they have not agreed to do so, ... nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement." *American Express Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir.1997) (citations omitted). However, "the FAA creates a presumption in favor of arbitrability; so, parties must clearly express their intent to exclude categories of claims from their arbitration agreement." *Paladino,* 134 F.3d at 1057. Nonetheless, "courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." *Goldberg v. Bear, Stearns & Co.*, 912 F.2d 1418, 1419-20 (11th Cir.1990).

5

**ARGUMENTS**

**I. Plaintiff's Position**

CRL argues that "Alabama law, as it applies generally to all contracts, may be applied to test the validity, revocability, and enforceability of [the] particular arbitration agreement under the FAA." *Young v. Jim Walter Homes, Inc.*, 110 F. Supp. 2d 1344, 1346 (M.D. Ala. 2000). Moreover, CRL notes, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue." 9 U.S.C. § 4. According to CRL, neither party has demanded a jury, and the material facts do not appear to be in dispute. Thus, CRL argues, this court can decide whether there was an agreement to arbitrate, and Alabama law should guide the court's decision.

CRL next argues that the Alabama Supreme Court has enforced an arbitration agreement in cases similar to this one. In *S. United Fire Ins. Co. v. Howard*, 775 So. 2d 156 (Ala. 2000), an insured tried to avoid arbitration by claiming that the application for insurance did not mention arbitration and by denying that he signed the policy. *Id.* at 161. The court rejected the notion that assent to arbitration had to be reflected through a signature, instead reasoning that

> The evidence in the record is undisputed that Howard paid premiums, renewed his policy, and submitted a claim under the policy. Howard did not cancel the policy or object to the arbitration provision. These facts manifested Howard's acceptance of Southern's offer to insure his car under the terms in its policy, which included the arbitration provision.

*Id.* at 162. The court acknowledged that it was "required to compel arbitration if, under 'ordinary state-law principles that govern the formation of contracts,' the contract containing the arbitration clause is enforceable." *Id.* (citation omitted). The court then summarized Alabama

6

law as follows:

> Alabama's general contract law permits assent to be evidenced by means other than signature, and, thus, the contract of insurance and the arbitration provision contained in it can be enforceable by the parties in the absence of signatures, where the evidence establishes the existence of the agreement. . . . Howard accepted and acted upon Southern's insurance policy, which contained the arbitration provision, by paying premiums, renewing the policy, and submitting a claim under the policy. Therefore, because Howard ratified the policy, the absence of his signature does not render the policy, or the arbitration provision contained in it, unenforceable.

*Id.* at 162-63. Thus, CRL argues, even if Long did not sign the application for insurance, he assented to the policy and arbitration agreement by paying premiums, receiving benefits, and filing claims under the policy.

Finally, CRL argues, under Alabama law a "plaintiff cannot pursue breach-of-contract and bad-faith-refusal-to-pay claims under the contract and at the same time 'repudiate its burdens and conditions.'" *S. Foodservice Mgmt, Inc. v. Am. Fid. Assurance Co.*, No. 1011570, 2002 WL 31439743 at *3 n.4 (Ala. Nov. 1, 2002). CRL also cites *Ex parte S. United Fire Ins. Co.*, No. 1002027, 2002 WL 1998342 (Ala. Aug. 30, 2002), in which the court stated that

> Although Dewrell contends that he did not, and could not, accept the terms of the Southern United policy because he did not receive a copy of either the policy or the arbitration rules referenced in the policy, it is undisputed that he is seeking to recover damages based on allegations that, among other things, Southern United breached the contract of insurance. Therefore, Dewrell is relying on the Southern United insurance policy to support his claim for damages. Because Alabama law prohibits a person from picking and choosing those provisions in a contract that he wants to apply, if Dewrell wants to recover for a breach of the insurance policy, he has no choice but to pursue his remaining claims under the terms of that contract.

*Id.* at *4. Thus, CRL argues, Long cannot sue for breach of contract and bad faith refusal to pay benefits under the policy without submitting to the arbitration provisions found in the insurance contract.

7

## II. Defendant's Response

Long counters by arguing that "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T v. Communications Workers of America*, 475 U.S. 643 (1960). "The requisite elements of [a contract] include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Ex parte Grant*, 711 So. 2d 464, 465 (Ala. 1997). Here, Long argues, there was no mutual assent to any arbitration agreement. To support his position, Long cites *Ex parte Cain*, No. 1001030, 2002 Ala. LEXIS 180 (Ala. June 14, 2002). Cain bought a mobile home from Chandeleur Homes, Inc. ("Chandeleur"), and then later sued it for fraud and breach of warranty. Chandeleur moved to compel arbitration and cited an arbitration provision found in the homeowner's manual. The warranty contract itself was not signed by either party, although there were signature lines, and it did not contain an arbitration provision. Chandeleur sought arbitration, making arguments similar to those made by CRL (i.e., cannot sue for breach of warranty and at the same time disclaim the arbitration provision).

The court agreed with Cain, and refused to compel arbitration. Among its reasons for the decision, the court noted that the warranty did not contain an arbitration provision, that Chandeleur failed to prove that the homeowner's manual was itself a contract, and that Cain submitted that he had never received the homeowner's manual or the limited one-year service warranty that was allegedly left in the kitchen drawer. Thus, the court concluded, there was no proof that the parties agreed to be bound by an arbitration agreement. *See also S. Energy Homes, Inc. v. Hennis*, 776 So. 2d 105 (Ala. 2000). In this case, Long argues, he never read, signed, or consented to any contract which would require him to arbitrate his claims. *See Oakwood Mobile*

*Home, Inc. v. Godsey*, 824 So. 2d 713 (Ala. 2001) (noting that a forged arbitration agreement is invalid). Rather, he received a summary of benefits, which he assented to by continuing to pay his premiums. *See Connell v. State Farm Mut. Auto. Ins. Co.*, 482 So. 2d 1165, 1167 (Ala. 1985) ("An application for insurance is an offer . . . and if an insurer issues a policy materially different from that applied for, the policy is a counter-offer which becomes binding only when accepted . . . ."). The summary of benefits, which Long did assent to, did not contain an arbitration provision.

Next, Long argues, CRL is estopped from applying the arbitration provision contained in the contract, because the contract was never delivered to him. Long cites Ala. Code § 27-14-19(a), which provides that

> Subject to the insurer's requirements as to payment of premium, every policy shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance, except where a condition required by the insurer has not been met by the insured.

According to Long, an insurer who fails to deliver a copy of the policy is estopped from asserting an otherwise valid exclusion or condition. *See Brown Mach. Works & Supply Co. v. Ins. Co. of N. Am.*, 659 So. 2d 51, 61 (Ala. 1995).[4] Long notes that the Alabama Supreme Court has commented on the question of whether Ala. Code § 27-14-19(a) applies to arbitration provisions, citing *S. Foodservice Mgmt., Inc. v. Am. Fid. Assurance Co.*, No. 1011570, 2002 Ala. LEXIS 321 (Ala. Nov. 1, 2002). In that case, the court did not apply § 27-14-19 because the insurance policy was delivered in compliance with the statute. However, Long argues, the implication is that the court would have extended *Brown* if the statute had not been complied

---

[4]Long provides a detailed analysis of *Brown* and the cases cited therein. *See* Def. Br. at 15-19.

with.[5]

Finally, Long argues, the cases cited by CRL are distinguishable. In *Howard*, the plaintiff did not recall whether he had received the policy, and he also signed an offer to renew his policy under the same terms and conditions, including the arbitration provision. 775 So. 2d at 162 n.4. Here, Long unequivocally states that he did not receive a copy of the policy, instead only receiving a summary of the benefits. The latter document, which did not contain an arbitration provision, is what Long contends he assented to. Long also distinguishes *Southern Food Service*, arguing that in that case there was no question as to whether the policy was delivered to the insured. Finally, Long argues that in *Southern United*, the real argument concerned which arbitration clause applied, not whether the parties assented to arbitration in the first place.

### III. Plaintiff's Reply

CRL again notes that assent may be manifested by such actions as paying premiums, submitting claims, and suing under the policy. *See Howard*, 775 So. 2d at 161-63. CRL argues that Long's contention that the summary of benefits is the only "policy" that he assented to ignores several crucial facts. First, Long filed claims under the policy, not the summary of benefits, and he is now suing under the policy, not the summary of benefits. Second, during discovery, Long produced a letter from CRL which states that "Enclosed is your insurance kit which includes your certificate booklet, medical identification cards and other forms you may

---

[5] Long notes that in *Cent. Reserve Life Ins. Co. v. Keifer*, 211 F.R.D. 445 (S.D. Ala. 2002), the court refused to apply § 27-14-19 to an arbitration provision. However, Long notes, in that case, the insured signed an application which contained an arbitration clause and a separate document of acknowledgment of arbitration.. The court also reasoned that the arbitration clause was a rider, not an exclusion. *Id.* at 450-51. Long argues that the arbitration "rider" relied upon by CRL would be a condition of coverage, which would make § 27-14-19 applicable. *See also Ex parte Clark*, 728 So. 2d 35 (Ala. 1998) (applying *Brown* to an insurance rider that was not delivered).

need." *See* Pl. Ex. E. The letter also asked Long to "Please make sure to read the enclosed information carefully. If you are not satisfied with this insurance, you may void all coverage by returning this certificate booklet and identification cards within fifteen (15) days after you receive them." *Id.* The certificate booklet provided that if it conflicted with the policy, the policy would control. *See* Pl. Ex. F.

Next, CRL argues, the cases relied upon by Long are distinguishable. In *Connell*, the court did state that an application for insurance is an offer to enter into an insurance contract. There is no dispute that an application was sent on Long's behalf. What triggers *Connell* is when the insurance company issues a policy that is materially different than what is applied for. Here, there is no evidence that CRL issued any policy that was materially different. The case does not stand for the proposition that the next piece of paper that is issued by the insurance company becomes a counter-offer. Long received a summary of benefits, not a counter-offer, and it was clear to him that the actual policy controlled any discrepancies between the two.

CRL also argues that the mobile home cases are distinguishable. In *Cain*, the arbitration clause was not in the warranty contract that the plaintiff was suing under. Here, the arbitration clause was clearly included in the policy. In *Hennis*, the court did hold that the plaintiff did not assent to an arbitration provision found in the warranty. 776 So. 2d 107-09. However, the court's very next statement was that "under the recent precedent of this Court, Hennis may not pursue his [warranty] claim . . . because he cannot rely on the express warranty and, at the same time, disavow the arbitration provision contained therein." *Id.* at 109. Here, Long assented to the terms of the policy by filing claims and suing under it. He cannot now disavow the arbitration provisions contained therein.

11

Finally, CRL argues, Ala. Code § 27-14-19(a) does not apply to this case. CRL again contends that Long assented to the terms of the policy by paying premiums, filing claims, and suing under the policy. CRL also argues that applying § 27-14-19(a) would be inconsistent with Alabama decisions providing for assent to the terms of a policy despite that policy never being received by the insured. *See Ex parte S. United Fire Ins. Co.*, No. 1002027, 2002 WL 1998342 (Ala. Aug. 30, 2002). Finally, CRL distinguishes *Brown*, arguing that an arbitration provision is neither an exclusion nor a condition, but rather a procedural process through which the insured may obtain a remedy.[6]

## CONCLUSIONS OF THE COURT

The court concludes that this action is controlled by *S. United Fire Ins. Co. v. Howard*, and *S. Foodservice Mgmt., Inc. v. Am. Fid. Assurance Co.* The motion to compel arbitration will be granted. Plaintiff will submit a proposed judgment within 10 days. The plaintiff will bear the costs of arbitration except for defendant's attorney's fees, unless said fees are specifically awarded.

This 27th day of March, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[6] CRL also argues that ProTruck was acting as Long's agent at all relevant times. CRL argues that if its motion turns on whether ProTruck was Long's agent, then an evidentiary hearing on that issue should be conducted.